30 C.C.P.A.(Patents)

## In re NELSON.
## Patent Appeal No. 4660.

Court of Customs and Patent Appeals.

Feb. 1, 1943.

Royal R. Rommel, of Washington, D. C., for appellant.

W. W. Cochran, of Washington, D. C., for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting all of the claims (Nos. 2, 12, 13, 15, 18, 20, 23, 25, 26, and 27) in appellant's application for a patent for an alleged invention relating to a method of hardening the inner wall of pump liners, cylinders, and like articles.

Claims 12, 13, 18, 20, and 27 are illustrative of the appealed claims. They read:

"12. The method of hardening steel articles which consists in heating the steel to above its critical hardening temperature, encasing the portion of the steel article which is to be hardened to a less degree than other portions of the steel article in an insulated covering, supplying quenching medium to the article while thus heated in sufficient volume to rapidly cool the exposed portions of the article which it is desired to harden, over a period of time, to harden the article to the desired depth, and subsequently appreciably slowing up on the supply of quenching medium distributed upon the article so as to bring the portion of the article which is covered by insulation thru the critical range more slowly than the portions hardened by the initial quenching action and to prevent latent heat from *by* insulated area from running back into the hardened area.

"13. The method of hardening steel which consists in heating the same to above its critical hardening temperature, subjecting the thus heated metal to the action of a quenching medium over a predetermined time period so as to harden the metal to a desired depth, and subsequently slowing up the cooling effect of the quenching medium and continuing it over a period of time greater than the time consumed for the intitial quenching action."

"18. The method of hardening steel cylinders, such as pump liners, which consists in heating the cylinder uniformly to a point above its critical hardening temperature, encasing a surface of the cylinder, either inside or outside, which it is desired not to harden to as great a degree as the other surface, in a heat insulating jacket, rotating the cylinder and its jacket, and during rotation of the cylinder spray quenching the exposed surface of the rotating cylinder while the cylinder is heated as aforesaid in order to harden the inner wall surface of the tube to the point of maximum hardness of which the steel is capable, and then continuing the quenching to a point where the tube is cooled so that

latent heat from the tube adjacent the heat insulating material cannot run back to destroy the initial hardness of the inner wall surface of the tube."

"20. The method of hardening steel and testing the same for depth of hardness which consists in heating a piece of steel to a temperature above its critical hardening temperature, quenching the steel so as to harden the same at a desired area, fracturing the steel so as to obtain a cross section of the steel, and tempering this fractured section so that at the fracture the steel will develop at the fracture one color throughout the portion of greatest hardness and a contrasting color throughout the remaining portion of the fractured section."

"27. The method of hardening steel articles which consist in heating the same to a point above its critical hardening temperature, and while so heated encasing the portion of the article which is not to be hardened in an insulation jacket, subsequently and while the article is still heated to a point above its critical hardening temperature simultaneously spray quenching the entire exposed surface of the heated steel article under predetermined volumetric control of the spray quenching medium and over a period of time to give the article through a desired thickness on the exposed quenched surface a martensitic structure having a Brinell hardness about 500 Brinell; and subsequently spray quenching the exposed surfaces of the article at a reduced volumetric control and over a longer period of time than the initial spray quenching operation to produce in the intermediate wall thickness of the article a troostitic-sorbitic structure having a Brinell hardness of over 300 Brinell, and a wall thickness on the surface which is insulated having a pearlitic structure in the neighborhood of 250 Brinell."

The references are:

Maxim, 446,532, Feb. 17, 1891;
Sampson et al., 539,010, May 7, 1895;
Hansen, 871,932, Nov. 26, 1907;
Sandberg et al. (Br.), 183,267, July 26, 1922;
Gray, 1,688,705, Oct. 23, 1928.

The purpose of appellant's process is to provide a pump liner or other tubular article composed of steel, the interior of which is subject to wear and abrasion, with an inner wall surface having a maximum degree of hardness of which the steel is capable, an annealed outer wall surface which is relatively soft and, therefore, machineable, and an intermediate portion having a gradually decreasing degree of hardness extending from the hardened inner wall surface to the annealed outer wall surface.

In carrying out the process defined by the appealed claims, the steel pump liner is uniformly heated to above the critical hardening temperature of the particular type of steel of which it is composed. It is then encased in a refractory jacket composed of suitable insulating material, and the inner wall surface sprayed with a cooling medium while the liner and its insulating jacket are rotated upon a horizontal axis. The spraying continues for a predetermined period to harden the inner wall surface to the desired degree and depth. The volume of the cooling medium is then appreciably reduced to retard the cooling action, and the slower cooling operation is continued for a sufficient period to cool the outer portion of the liner gradually and prevent latent heat in such portion from traveling inwardly and destroying the initial hardness of the inner wall surface.

The patent to Maxim relates to a process and an apparatus for hardening the surface of the bore of a gun and toughening the metal around the bore. The gun barrel is supported in a *vertical* position upon a rotatable platform in a furnace, and is rotated during both the heating and cooling processes. The patentee states that after the barrel has been heated to the proper temperature, a cooling fluid, such as oil, "is forced suddenly and with great violence into and through the heated gun barrel," that the oil "flows through the barrel very rapidly at first and more slowly afterward as the pressure in the accumulator diminishes" and "not only hardens the interior surface" of the barrel, "but the cooling of the inside of the barrel before the outside is allowed to cool causes the outer layers or portions of the barrel to shrink upon the interior layers or portions thereof with great force, setting up practically the same stresses in the mass that are set up by the various rings or hoops in a built-up gun, the exterior of the gun being in a state of tension, while the inside is in a high state of compression." The patentee further states that in his process the exterior of

the gun barrel is subjected to heat while the cooling medium is applied to the bore of the barrel.

The material difference between the patentee Maxim's process and the process defined by the appealed claims is that in the patentee's process the *outer portion of the gun barrel is subjected to heat* while the bore of the barrel *is quickly and then more slowly cooled,* whereas in appellant's process, heat is not applied to the outer surface portion of the pump liner during the cooling of the inner wall, but, on the contrary, the heat in the outer portion is temporarily retained by means of an insulating jacket and is dissipated gradually by the application of the cooling medium to the inner wall surface.

The patent to Sampson et al. relates to the manufacture of face hardened armor. The patentees disclose a process of hardening certain portions of armor plate and annealing other portions. In the patentees' process, those portions of heated armor plate which it is desired to harden are sprayed with a cooling medium, and those portions which it is desired to anneal are protected with asbestos boards of appropriate shape to prevent contact with the cooling medium and rapid radiation of the heat from such portions. · There is nothing in the patent to indicate that the cooling medium is applied for a sufficient length of time to prevent the flow of heat from the unquenched portions into the quenched portions of the plate.

The patent to Hansen relates to a process of tempering and annealing car wheels. The purpose of the patentee's process is to harden the tread face of the car wheel, and, at the same time, anneal the inner portion of the tread and the hub and web portions so that such annealed portions will be soft and tough. In his process, the patentee's wheel is heated and then enclosed within a suitable case having a heat-retaining chamber and a cooling chamber. The heat-retaining chamber is insulated by means of refractory members and encloses the inner portion of the tread and the hub and web portions of the wheel. The outer or face portion of the tread extends into the cooling chamber where it is sprayed with a cooling medium, such as water. The heat in the hub and web portions and in the inner portion of the tread is dissipated slowly. The patentee states that the spraying of the cooling medium against the face of the tread continues "during all or only a portion of the time of the cooling of the" other portions of the wheel.

The patent to Sandberg et al. relates to a method of hardening the internal surface of steel cylinders. In the patentees' method, a cylinder, such as a gun barrel, is heated to a temperature above the critical range. It is then *rotated upon a horizontal axis* and the bore thereof rapidly cooled by a cooling medium, such as air and atomized water. The patentees state that "the rate of cooling through the critical range" is "insufficiently rapid to produce hard or martensitic structure in any part of the cylinder." They also state that the "supply of air and water can be so regulated as to produce any desired rate of cooling." In the patentees' process, the *outer portion of the gun barrel is permitted to cool gradually.* It is not, however, in contact with insulating material as is the outer portion of the cylinder in appellant's method or as are the hub and web portions of the car wheel in the Hansen reference. It is stated in the patent that:

"It is known that by cooling the interior of a heated hollow cylinder more rapidly than the exterior, the former assumes a high state of compression and the latter a high state of tension, this condition being that in which the cylinder is best adapted for resisting high internal pressure. This result is due to the difference in the rate of thermal contraction due to the different rate of cooling."

After describing a method of determining the stress measurements of a cylinder composed of a certain type of steel treated by their method, the patentees state:

"In addition to the stress measurements Brinell impression tests showed that the hardness after treatment varied from approximately 190 Brinell on the interior to 160 Brinell on the exterior, an increase of 30 points.

"Microscopical examination showed a *partly sorbitic structure in the interior, and a normal pearlitic structure in the exterior.* Increase in the rate of cooling of the cylinder would have *increased the value of the stresses and also the hardness of the internal metal.* These two changes can however be varied independently of one another by varying the temperature at which more rapid cooling of the interior is stopped and by the regulation of the subsequent cooling of the cylinder as a whole." (Italics ours.)

It is evident from the disclosure in the Sandberg et al. patent that by regulating the rate and extent of cooling, the patentees obtained by their method a *partly sorbitic structure* on the interior of their cylinder, rather than a *martensitic structure* as stated in the decision of the Board of Appeals, and a *pearlitic structure* on the exterior, a result which they apparently desired. The patentees state, however, that the supply of cooling medium could be so regulated as to produce *any desired rate of cooling;* that by increasing the rate of cooling, the hardness of the inner surface of the cylinder and the "value of the stresses" would be increased; and that those "two changes" could be brought about "independently of one another" by varying the rate of cooling of the inner surface and regulating the "cooling of the cylinder as a whole."

The patent to Gray discloses a method of heat-treating the threaded end portion and an adjacent portion of a sucker rod. By the patentee's method, those portions of a sucker rod are heated to from 1400° to 1600° F. The threaded portion is then rapidly cooled for about thirty seconds by a cooling medium, such as oil. It is then removed from the cooling medium, and the heat from the uncooled portion is permitted to flow into the cooled portion. In this connection, the patentee states that the temperature at which the cooled portion is thus reheated is determined by the temperature at which the cooled and uncooled portions of the sucker rod "reach a temperature equilibrium." He further states that "After the quenching, the whole rod is merely laid out in the atmosphere, the quenched portion is re-heated to equilibrium temperature and the whole rod then cools down to normal temperature," and that by varying the speed and the period of time "of quench" and regulating the flow of the quenching medium, *the flow of heat from the unquenched into the quenched portion can be regulated and controlled.*

Claims 2, 12, 15, 18, and 23 were rejected by the Primary Examiner on the patents to Maxim, Sampson et al., and Hansen, in view of the patent to Sandberg et al., the examiner stating that the patents to Maxim, Sampson et al., and Hansen disclose the hardening of one portion of an article by quenching, and the annealing of the other portion by permitting it to cool slowly, and that the patent to Sandberg et al. discloses the idea of cooling the interior or bore of a cylinder at a more rapid rate than the exterior. The examiner pointed out that the rotation of an article during treatment was disclosed in the patents to Maxim and Sandberg et al., and stated that "The use of an insulating means [such as appellant's insulating jacket] is deemed the full equivalent of the means used by Maxim to prevent a quick cooling and hardening of the exterior of the liner. The cooling medium in Maxim is forced through the tube at a fast rate at first to produce a quick quench and then the rate of flow of the quenching medium is reduced and provides slower cooling as in applicant's case." The examiner also stated that the patent to Hansen "solved the same problem in a like manner by the use of insulation to retain the heat in the portion desired soft and machineable."

Claim 25, which is similar to quoted claim 18, was rejected by the Primary Examiner on the patents to Sandberg et al., Gray, and Maxim.

Claim 26, which is similar to quoted claim 12, and claim 27 were apparently rejected by the examiner on the patents to Maxim, Hansen, Sampson et al., Sandberg et al., and Gray.

With reference to claim 27, the examiner stated that the "hardness recited" in that claim was "within the range of hardness usually produced in the prior art."

The Board of Appeals was of opinion that claims 2, 12, 15, 18, 23, 25, and 26 were unpatentable over the disclosure in the Maxim patent, in view of the disclosure in the patent to Sandberg et al. It placed very little reliance on the patents to Sampson et al. and Hansen, stating that they were not as close as the Maxim patent and were "mainly cumulative." The board further stated that claim 13 reads "in all substantial respects directly on the Gray patent."

Claim 20 was rejected by the board for reasons hereinafter stated.

■ In its discussion of the appealed claims, the board did not specifically refer to claim 27. However, as it affirmed the decision of the Primary Examiner rejecting all of the appealed claims, we assume that it approved of the rejection of that claim for the reasons stated by the examiner. In re Wagenhorst, 64 F.2d 780, 20 C.C.P.A., Patents, 991.

As hereinbefore noted, the patent to Maxim discloses the heating of the exterior wall of the gun barrel while the cooling medium is being rapidly and then slowly applied to the surface of the bore of the barrel. The patentee, of course, must have had in mind, although he did not so state, that the heating of the exterior of the gun barrel would eventually be discontinued. He does not, in our opinion, suggest the use of an insulating material to retain the heat in the exterior wall of the gun barrel. However, the patent to Hansen clearly discloses the idea of heating a steel article, insulating that portion of the article which it is desired to anneal, and quenching that portion which it is desired to harden. A similar idea is disclosed in the patent to Sampson et al. It is true that neither Hansen nor Sampson et al. was concerned with the treatment of pump liners, gun barrels, or other cylinders. However, the patent to Sandberg et al. relates to the heat treatment of cylinders while the same are being rotated on a horizontal axis, and, although it does not suggest the idea of insulating the exterior walls of the cylinders for the purpose of retaining the heat for a longer period of time as does appellant, the suggestion of the use of an insulating material is clearly disclosed in the patents to Hansen and Sampson et al. Although Sandberg et al. do not expressly state that in order to secure a hard or martensitic structure in the interior of the cylinder, heat from the exterior should be prevented from flowing into the interior, that thought is plainly suggested in the patent to Gray, and it would seem to be obvious from what is taught in the Sandberg et al. patent that if it was desired to secure a hardened or martensitic interior surface, the heat from the exterior could, and should, be prevented from flowing into the hardened interior surface of the cylinder by continuing the application of the quenching medium for a predetermined period of time.

■ We are in agreement with the argument presented here by counsel for appellant that the disclosure in the patent to Maxim is not as pertinent to the issues here presented as the decisions of the tribunals of the Patent Office would seem to indicate. We are of opinion, however, for the reasons hereinbefore stated, that claims 2, 12, 15, 18, 23, 25, 26, and 27 do not define patentable subject matter, and that the tribunals of the Patent Office were right in rejecting them on the prior art cited. In so holding, it should be understood that we have given full consideration to the statements contained in appellant's affidavit of record.

Claim 13, which is broader than the other appealed claims, calls broadly for heating a steel article to above its critical hardening temperature, quenching the heated metal for a predetermined period of time so as to harden it to the desired depth, "slowing up the cooling effect of the quenching medium," and continuing the slower cooling over a period of time greater than the initial quenching period.

Claim 13 was rejected by the Primary Examiner on the patent to Gray, the examiner stating that it was old, as disclosed in that patent, to "vary the cooling effect of the quenching medium during the quench," and that it would not involve invention "to continue the reduced cooling effect for a particular time." The examiner further stated that if it was desired to prevent the heat from the unhardened portion flowing into the hardened portion, it would be obvious that this could be accomplished by continuing the reduced cooling quench for a longer period of time.

The Board of Appeals concurred in the views expressed by the Primary Examiner as to claim 13.

The patent to Gray, as hereinbefore noted, clearly discloses the idea of varying the speed "of quench" by varying the flow of the cooling medium, and, although the patentee desired that the heat from the unquenched portion of the sucker rod flow into the quenched portion, it is stated in the patent that the flow of heat from the unquenched portion into the quenched portion could be regulated and controlled by regulating the speed of the quenching operation.

We are of opinion, therefore, that claim 13 was properly rejected by the tribunals of the Patent Office on the disclosure in the patent to Gray.

Claim 20 was rejected by the Primary Examiner on the patent to Sandberg et al., the examiner stating:

"It is well recognized in the art that the different degrees of hardness produced on quenching produces a difference in the microstructure of the metal treated. This structure may be seen in many cases by the naked eye and in other cases by the aid of a microscope and to oxidize the

same (draw or temper the hardened article) to make some of the structure noticeable by difference in color is not deemed invention and especially so as tempering is old in the art."

With reference to claim 20, the board said: This claim involves quenching steel to harden it, fracturing it, and then tempering the fractured portion. It seems to us that it would be an obvious modification to fracture the steel in this [the Sandberg et al.] patent to obtain a view of a cross-section thereof and thereby determine, by the color of the hardened portion, how much quenching is necessary to obtain the desired product.

It will. be observed that claim 20 relates to a method of hardening steel and testing the same for depth of, hardness. After the steel is heated to above its critical hardening temperature, it is quenched so as to harden it at a desired area. It is then fractured so as to obtain a cross-section, and the fractured section is tempered so that, as stated in the claim, "the steel will develop at the fracture, one color throughout the portion of greatest hardness and a contrasting color throughout the remaining portion of the fractured section." The method of testing defined in that claim is not disclosed in any of the prior art references, and appellant states in his affidavit (filed subsequent to the final rejection of the appealed claims, but prior to the examiner's statement to the board) that "it was not known in the prior art that the depth of hardening could be accurately determined through color contrast in a hardened steel article by fracturing a section of the steel article, and then tempering the fractured portion at any particular temper," and that "Technical literature contains no reference whatsoever to such method of determining the depth hardness of steel." Appellant further states in his affidavit that he was. aware of the fact "that a piece of steel, hardened and later polished, and then heated in a low temperature range, say from 200 degrees to 600 degrees F., will show a temper color *uniformly* over its entire external surface due to oxidation." (Italics quoted.)

Although the Primary Examiner referred to appellant's affidavit, no reference was made to that portion relating to the process defined in claim 20.

The Board of Appeals made no reference to the affidavit.

Appellant's affidavit is consistent with the disclosure in his application of the method defined in claim 20. The only difference between the process defined in claim 20 and that which appellant concedes is old in the art is the step of reheating or tempering a *fractured section* of a steel article "so that * * * the steel will develop at the. fracture one color throughout the portion of greatest hardness and a contrasting color throughout the remaining portion of the fractured section." Appellant states in his affidavit that as a result of the prior art process the temper color of a *steel article* is uniform over the entire external surface, whereas as a result of appellant's process the color of the hardened portion of the *fractured section* of a steel article differs from that of the unhardened portion of the *fractured section.*

In view of the fact that the prior art cited does not disclose or suggest the process defined in claim 20, and as that portion of appellant's affidavit hereinbefore set forth was not referred to by either of the tribunals of the Patent Office, we are unable to hold, on the record presented, that that claim was properly rejected.

For the reasons stated, the decision of the Board of Appeals is modified, being affirmed so far as it held the process defined in claims 2, 12, 13, 15, 18, 23, 25, 26, and 27 to be unpatentable over the references of record, and reversed so far as it held the process defined in claim 20 to be unpatentable.